Marilyn Heiken, OSB #923308
mheiken@justicelawyers.com
**JOHNSON JOHNSON LUCAS & MIDDLESTON, PC**
975 Oak Street, Suite 1050
Eugene, OR 97401
Telephone: (541) 484-2434
Facsimile: (541) 484-0882

*Attorneys for Plaintiff and the Proposed Class*
*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| BETHANY ANDERSON, on behalf of themselves and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ARB GAMING, LLC, d/b/a Modo.us,<br><br>Defendant. | Case No. 6:25-cv-2069<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**1. DECLARATORY JUDGMENT;**<br>**2. VIOLATION OF OREGON GAMBLING LOSS RECOVERY STATUTE (ORS 30.740, *et seq.*); and**<br>**3. VIOLATION OF OREGON UNLAWFUL TRADE PRACTICES ACT (ORS 646.605, *et seq.*)**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Bethany Anderson, individually and on behalf of the other members of the below-defined Oregon class (the "Class"), hereby alleges against Defendant ARB Gaming, LLC, d/b/a Modo.us ("Modo" or "Defendant"), upon personal knowledge as to herself and her own acts, and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

## NATURE OF THE ACTION

1. This class action lawsuit is brought by Plaintiff seeking damages, declaratory, injunctive, and equitable relief individually and on behalf the other Class members, each of whom is an Oregon resident who paid and lost money or other things of value on Modo.us (the "Class").

2. Modo owns and operates "Modo Casino"—an unregulated and illegal gambling website located at www.Modo.us (the "Modo Casino Website" or "Website").

3. Regulators have concluded Modo operates a "felony criminal enterprise" in violation of gambling laws. In April 2025, as part of its efforts to shut down operators who provide access to unlawful online gambling, the Arizona Department of Gaming—where Modo is headquartered—described Modo as a "felony criminal enterprise[]," and took "decisive enforcement action" to shut down the Modo Casino Website in Arizona. *See* Exhibit 1. Modo's Casino Website is likewise unlawful in Oregon, yet Modo continues to operate in this State with impunity.

4. Gambling is heavily regulated in Oregon and unless the legislature specifically authorizes it, gambling is unlawful. *See* ORS 167.108, *et seq.*; ORS 167.117(24) ("unlawful" means "not specifically authorized by law"). Modo's Casino Website does not promote any external product or service; it *is* the product. Modo's gambling scheme operates continuously and indefinitely, offering no legitimate business purpose apart from wagering for prizes.

5. On the Modo Casino Website, users play "Hundreds of Casino-Style Games," including blackjack, slots and other "classic table games" (collectively, the "Chance Games"). Participants wager money for the opportunity to play these Chance Games and to receive prizes, such as cash or cash-equivalent gift cards—if they win.

6. Although Modo advertises "free" play, those free plays do not award the prizes that attract Oregon residents, including Plaintiff, to the Modo Casino Website. In reality, Modo's "free" play serves only as a psychological teaser to induce players to gamble with real money. Oregon residents access the Modo Casino Website to win prizes—exactly as Modo intends—and the only

way to win those prizes is to wager with coins that, apart from a nominal allotment Modo provides new users, can be obtained only through purchase.

7. Because Modo requires participants to risk money or other things of value for a chance to win a prize, its Casino Website constitutes an illegal gambling operation under Oregon law.

8. The illegality of Modo's scheme is not a close question in a state with stringent anti-gambling laws like Oregon. Plaintiff and Class members each wagered and lost money or other things of value on the Modo Casino Website. In addition, Modo engaged in unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce in Oregon, including representing and causing Plaintiff and Class members to believe the Modo Casino Website was legal, approved or regulated by the State of Oregon when, in fact, it operates as illegal gambling in violation of Oregon law.

## THE PARTIES

9. Plaintiff Bethany Anderson is domiciled in Oregon and resides in Marion County. Plaintiff wagered and lost money on Defendant's illegal gambling. As a result, she suffered an injury in fact resulting in the loss of money or property that is recoverable in Oregon. Plaintiff did not know Modo.us was illegal gambling in Oregon. Based on Modo's advertising and representations, Plaintiff believed Modo.us was lawful in the State of Oregon. Had she known the truth, she would not have participated in online gambling on Modo.us or lost money.

10. Defendant ARB Gaming, LLC is a for-profit business entity registered in Delaware and with its registered office at13802 N Scottsdale Rd, Suite 151-94, Scottsdale, Arizona. Defendant owns, operates and markets the Modo.us Casino Website. Through its Casino Website, Defendant conducts business in Oregon, including this District.

## JURISDICTION AND VENUE

11. This Court has diversity jurisdiction over this action under 28 U.S.C. §§ 1332(d) because the amount in controversy for the Class exceeds $5,000,000, exclusive of interest and

costs, and because Plaintiff and one or more of the other Class members are citizens of a different state than Defendant.

12. Venue is proper in this District under 28 U.S.C. § 1391 because Modo is deemed to reside in any judicial district in which it is subject to personal jurisdiction. A substantial part of the events or omissions giving rise to the claim occurred within this District. Plaintiff wagered and lost money on Modo in this District, and Modo has marketed and advertised its Website in this District, made its Website accessible in this District, accepted wagers in this District, and paid out prizes in this District.

13. This Court has personal jurisdiction over Modo because Modo has systematically and continually conducted, and continues to conduct, business in Oregon, and this lawsuit arises out of those contacts with Oregon.

14. At all relevant times, Modo has systematically and continuously conducted business in Oregon through the operation of an an interactive, commercial website that allows Oregon residents to wager money and win prizes.

15. Modo specifically intended and foresaw that Oregon residents would access and gamble on its Casino Website. Modo knew that Oregon residents use its Casino Website because it requires users to disclose their state of resident when registering.

16. Modo further encouraged gambling by Oregon residents by failing to list Oregon as an excluded territory and by advertising to Oregon residents in Oregon, including sending promotional and account-related emails to Oregon residents.

17. Modo profits substantially from Oregon residents, who constitute a significant portion of its customer base and revenue. Modo also collects and maintains personal and transactional data from Oregon users.

18. Modo affirmatively ensured that Oregon residents would have access to the Casino Website so that they could gamble online. Widely available geolocation technology allows online platforms to detect a website visitor's location—including the state in which they are located—and restrict access where gambling is illegal, such as in Oregon. Modo utilizes that technology for

other states, but deliberately chose not to use that technology for Oregon residents to its Casino Website, thereby maximizing its gambling profits from this State.

## FACTUAL BACKGROUND

### I. The Problem of Online Gambling

19. The online gambling industry is profiting from gambling addiction the same way other industries have profited from human dependency—by exploiting vulnerable individuals for financial gain.

20. For decades, the proportion of Americans diagnosed with pathological gambling held steady at less than one percent, with approximately seven million Americans suffering from a gambling addiction at an annual "social cost" of $7 billion. But those numbers have skyrocketed with the advent of online gambling. From 2021 to 2022, calls, texts, and messages to the National Problem Gambling Helpline increased by 45 percent. Studies show that up to 30 percent of problem gamblers have attempted suicide, and many more report suicidal ideations.

21. The United States may be on the cusp of an explosive growth of gambling addiction akin to the opioid crisis—fueled by the proliferation of online gambling websites accessible from any phone or computer. Gambling disorder typically develops over five to seven years, the same period during which online gambling has expanded exponentially. Despite this, the federal government spends no money on gambling addiction programs, and state gaming commissions regulate gambling unevenly, at best.

22. The resulting harm is not limited to gamblers. Gambling addiction destabilizes families, damages relationships, and causes significant economic harm to spouses, partners, children, and employers.

23. Online gambling addiction also has massive social consequences, resulting in the drain on state government funds to address addiction, the rise in teenage online gambling addiction, and higher incidences of crime associated with online gambling addiction.

24. This rise also includes a relatively new phenomenon: gambling addiction among minors under the age of 18. Unlike traditional brick-and-mortar casinos that can exclude minors,

online gambling websites are easily accessible to underage users. Websites like Modo.us are designed to attract adolescents as well as adults, and are contributing to the sharp rise in online gambling addiction among minors.

25. Treating online gambling addiction poses unique challenges. Unlike substance abuse treatment—where the addict can remove physical triggers—digital gambling occurs on devices that are integral to everyday life. The temptation to gamble is constant, available at home, work, restaurants, or anywhere with an internet connection. Furthermore, while billions of dollars of federal funding are dedicated to alcohol, tobacco and drug addiction programs, there are no federal funds allocated to support gambling addiction services.

26. To make matters worse, although the casino gaming industry is one of the most regulated businesses in the United States, online gaming websites like Modo.us are unlicensed and unregulated. As one gambling treatment provider warned, "[u]nregulated platforms [like Modo.us] can pose significant risks for players struggling with gambling addiction. The lack of proper safeguards often exacerbates financial and emotional stress, making it harder for individuals to regain control."

27. Modo's business practices exacerbate the risks and harms of gambling addiction. By allowing users to fund gambling with credit cards, Modo makes it easier for consumers—particularly those struggling with impulse control—to wager money they do not have. This practice violates the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. §§ 5361-5367, which prohibits accepting payments in connection with unlawful internet gambling. As a result, users have incurred massive debt gambling on Modo.us, deepening the financial and psychological toll of addiction.

28. The bottom line is that Modo allows users to play online casino games and wager real money while defying Oregon's constitutional and statutory prohibitions against gambling, offering inadequate player protections, exploiting minors, and siphoning revenue from this State.

29. Oregon law expressly prohibits operating or offering online gambling casinos, including websites that offer slot machines, blackjack, roulette, and poker. Oregon's strong and long-standing public policy is against unregulated and illegal gambling in all forms.

## II. Defendant Modo Operates a Gambling Website

30. Modo operates one of the top-ranked online casino platforms in the United States. In June 2025, the website "Modo.us" ranked #7 in the global "Casinos" category and ranks among the top 10 casino platforms worldwide.

31. Modo admits that it offers casino-style "Chance Games." According to Modo, "There are no guarantees! Slots and casino-style games are based on chance, so every session is unique" and "every spin is a new chance for fun!"[1] Modo further explains that its "games are games are powered by a random number generator (RNG), making every spin completely unpredictable."[2] Modo also represents that "Sweepstakes Coins . . . let you play games for a chance to win redeemable SC, which can be exchanged for real cash prizes."[3] Through these admissions, Modo acknowledges that the outcomes of its games are determined by chance rather than skill, and that its platform allows users to wager for the opportunity to win items of real-world monetary value.

32. When users log onto the Casino Website, the first thing they see is an array of colorful, digital slot machines and other games of chance. Near the top of the screen, the Casino Website displays the user's gambling balance in the top right corner of the screen, denoted by gold and green coin icons—signifying real monetary value within the platform:

---

1 *Modo*, "What is RTP (Return to Player)?" (Feb. 19, 2025), https://support.modo.us/en_us/what-is-rtp-(return-to-player)-B1jgg9qVJl (last visited Nov. 5, 2025).

2 *Id.* ("sometimes you might win big, and other times, not so much. That's because ***games are powered by a random number generator (RNG), making every spin completely unpredictable!***") (last visited Nov. 5, 2025) (emphasis added).

3 *Modo*, "Gold Coins and Sweepstakes Coins – What's the Difference?" (Mar. 21, 2025), https://support.modo.us/en_us/what-is-the-difference-between-gold-coins-and-sweepstakes-coins-ByDlqq_Nlx (last visited Nov. 5, 2025) ("Sweepstakes Coins . . . let you play games ***for a chance*** to win redeemable SC, which can be exchanged ***for real cash prizes***.") (emphasis added)

Gambling balance denoted by gold and green coin icons, which are placed between "Get Coins" and "My profile" buttons.




33. The Casino Website offers "live" table games that replicate the casino experience. Players interact directly with live dealers—visible via a webcam—while placing wagers on chance games such as blackjack and roulette:






34. The Casino Website's slot machines come in a wide range of styles and themes, identical to those found in a brick-and-mortar casino in Las Vegas. These Casino Website games use the same mechanics, pay-line structures, and psychological triggers—including lights, sounds, and intermittent reward patterns—that are scientifically recognized to reinforce compulsive gambling behavior. Modo markets these features with the same appeal and excitement associated with casino gaming:






35. The Modo Casino Website even contains a detailed explanation of the "volatility" of its slot machines—a standard term in the casino industry to describe how frequently a slot machine will hit a winning combination and the size of the expected payouts. This industry terminology underscores that the Casino Website's purpose is gambling:

**Articles in this section**

Can I play games on my smart phone device?

What is a Random Number Generator (RNG)

What is Game Volatility

## What is Game Volatility

2 years ago · Updated

**Volatility:** a measure of how frequently a slot machine pays out and how large the payouts are. It is used to indicate the likelihood of hitting a winning combination and the potential size of the win.

**Low volatility**: refers to slot games that offer small, frequent wins rather than large, infrequent ones. This means that players can expect to receive a steady stream of payouts over time, although the amount of each payout may be relatively small. These types of games can be attractive to players who enjoy a more predictable, steady pace of play and prefer to avoid the ups and downs of high volatility games.

**High volatility:** Games that offer the potential for large payouts, but they may not occur frequently. These types of games may result in either a big win or no winnings at all during a short gameplay session. In contrast, low volatility slots provide smaller, more frequent payouts.

There are also slot games with **Medium Volatility**, which fall in between the extremes of high and low volatility. These games offer a balance of frequency and size of payouts, providing a mix of small and large wins over time.

The choice of which game to play depends on your personal preference. If you enjoy the excitement of potentially winning big, you may prefer high-volatility games. If you prefer a more relaxed, consistent gameplay experience, low-volatility games may be a better fit for you. Remember, slots are games of chance and are meant to be enjoyed as a form of entertainment.

On Modo.US, volatility is clearly displayed before entering each game so that you, as a player, can get a sense of the playing experience you will get before entering.

36. Despite its casino-style design, operation, and the clear purpose of the Casino Website, Modo carefully avoids using the term "gambling." Instead, Modo misleads users—including vulnerable populations struggling with gambling disorder—by using euphemisms such as "social gaming" and "sweepstakes" to disguise the true nature of its Casino Website.

37. In reality, the Casino Website functions nothing like a legitimate "sweepstakes." Traditional sweepstakes promotions are limited-term marketing events intended to promote an independent product or service and typically expire after a few weeks or months. In contrast, Modo's so-called "sweepstakes" runs indefinitely and exists solely to generate revenue from gambling revenue. It is common for individual users in Oregon to lose tens of thousands of dollars gambling on Modo's Casino Website. The Casino Website's gambling operation is not incidental to another business, it *is* the business being promoted.

## III. Modo Offers a Repacked Form of Illegal Gambling

### A. An Old Gambling Gimmick Revived Online

38. Modo will ask the Court to disbelieve its own eyes and conclude that the Modo Casino Website offers legal "sweepstakes," not gambling. That is an old gimmick. In the early 2000s, operators of so-called "Internet cafés" used the same gimmick—claiming to sell innocuous products such as Internet time or phone minutes while giving customers "free" sweepstakes entries to play casino-style games for cash prizes. Courts and law-enforcement agencies uniformly held that such schemes were pretexts for illegal gambling.

39. Courts repeatedly rejected the idea that separating the purchase (consideration) from the game of chance could legalize gambling. *See, e.g.*, *Pre-Paid Solutions, Inc. v. City of Little Rock*, 343 Ark. 317, 34 S.W.3d 360 (Ark. 2001) (finding "promotional sweepstakes" vending machines were illegal gambling devices); *Moore v. State,* 309 So. 3d 7, 9 (Miss. Ct. App. 2020) (affirming racketeering and gambling convictions where Internet-café customers obtained "sweepstakes" play codes only through purchases of other goods); *Barber v. Jefferson Cty. Racing Ass'n, Inc.*, 960 So. 2d 599, 612 (Ala. 2006) (rejecting argument that Internet-time purchases removed consideration element); *People ex rel. Green v. Grewal*, 61 Cal. 4th 544 (Cal. 2015)

(upholding injunction against "Internet-café" sweepstakes operation). The Ohio Court of Appeals rejected a similar sweepstakes scheme in *City of Cleveland v. Thorne*, 987 N.E.2d 731 (2013): "the justice system is not some lumbering oaf who must ignore the patently obvious gambling scheme apparent here simply because of a contrived separation between consideration and the scheme of chance." The court added, "there is no justification for ignoring the nature of the transaction simply because the system is designed in such a way as to artificially isolate one part of the illegal transaction from another. The justice system is not so blinded by chicanery."

40. On summary judgment, a federal court has recently reached the same conclusion about a business model materially identical to Modo's. *See Larsen v. PTT, LLC*, 737 F. Supp. 3d 1076 (W.D. Wash. 2024) (holding "social casino" website using two-coin system constituted illegal gambling).

**B. <u>Modo's Two-Coin System Satisfies All Elements of Gambling</u>**

41. Modo replicates the criminal Internet cafés by using a dual-currency system: "Gold Coins" and "Sweepstakes Coins"—both of which function as casino chips.

42. Gold Coins can be used for gameplay, but have no redeemable value. Sweepstakes Coins can be used to play the same games, yet they carry real monetary value and can be redeemed for cash or cash-equivalent prizes.

43. News users receive a small, non-replenishing allotment of Gold Coins and Sweepstakes Coins. These coins are required for gameplay. The chance for a player to win more coins or lose their bet is a fixed random chance and not skill-based. All games require a "minimum bet" of coins before play can begin. Once a player's coin balance falls below the minimum wager amount, the player cannot continue playing until purchasing additional coins.

44. Players may purchase different packages of virtual Gold Coins with real money, ranging from approximately $0.99 for 1,000 Gold Coins to $299,99 for 2,000,000 Gold Coins.

45. Each Gold Coin package comes bundled with a proportional number of "Sweepstakes Coins" ("SC")—and the more money spent, the more Sweepstakes Coins received. In effect, buying Gold Coins is the only meaningful way to acquire Sweepstakes Coins.

46. Critically, ***the number of Sweepstakes Coins scales directly with the amount of real money spent or won***. There is essentially a 1:1 ratio between the dollars paid and the number of Sweepstakes Coins provided. For example, purchasing $4.99 of Gold Coins yields 5 Sweepstakes Coins (SC), which can later be redeemed for $5 in cash. The number of Sweepstakes Coins thus tracks the amount of real money wagered and won.[4] As shown below, Sweepstakes Coins are bundled exclusively with paid Gold Coin purchases:




[4] Although Defendant offers a few Gold Coin packages that do not include Sweepstakes Coins, that is for show. Only a tiny fraction of website users, if any at all, purchase those packages because they do not allow users to engage in the primary purpose of the Casino Website, which is real-money gambling.

47. Likewise, Sweepstakes Coins are redeemable on a 1:1 basis for cash or cash-equivalent prizes. For example, 100 Sweepstakes Coins can be redeemed for $100, confirming that Sweepstakes Coins represent real monetary value and serve as the prize component of Defendant's gambling scheme.

48. Defendant claims that no purchase is necessary to buy Sweepstakes Coins and that they are just a "bonus" added to the purchase of Gold Coins. In reality, Defendant sells both together as a single package and will not provide Sweepstakes Coins in any meaningful quantity unless users buy Gold Coins. As noted above, claiming that Sweepstakes Coins are a "free" bonus included with the purchase of Gold Coins is the same old tactic that criminal operators of illegal Internet cafés—an evasion courts and law-enforcement agencies have long rejected.

49. Players may use real currency to purchase additional virtual Gold Coins and Sweepstakes Coins through the Casino Website. In this way, the purchase of virtual coins is identical to what happens when a player purchases casino chips in a brick-and-mortar casino, which can then be used to place wagers at table games.

50. There are several other factors that show that the true purpose of the Modo Casino Website is gambling, and that just like the Internet cafés that preceded the launch of Modo's Website, the use of the term "sweepstakes" is a pretext for gambling.

51. First, the Modo Casino Website's casino-like atmosphere and imagery—and Modo's own use of gambling terminology, including the word "casino" in the website name (i.e., "Modo Casino")—demonstrates that the true purpose of the Modo Casino Website is to promote gambling, as opposed to a sweepstakes promotion of some other good or service. Indeed, "casino" is commonly defined as "a building or room used where people play gambling games such as roulette."[5]

---

[5] https://www.collinsdictionary.com/us/dictionary/english/casino; *see also* https://www.britannica.com/dictionary/casino ("a building or room that has games (such as roulette or blackjack) for gambling"); https://www.merriam-webster.com/dictionary/casino ("a building or room used for social amusements specifically: one used for gambling").

52. Second, Modos's "sweepstakes" runs continuously and indefinitely. Genuine promotional sweepstakes are temporary marketing events designed to draw attention to a separate product or business and typically end within weeks or months. Modos's operation, by contrast, never ends because the gambling *is* the product.

53. Third, Modo's payout structure mirrors casino economics, not legitimate promotions. While promotional sweepstakes typically award a tiny fraction of a company's revenue in prizes—for example, McDonald's annual Monopoly sweepstakes offers about $1 million in prizes from billions in sales—casinos return roughly 80–96 percent of wagers to players. Modo boasts a "return-to-player" ("RTP") rate of 96–98 percent, indistinguishable from commercial casino standards.

54. Fourth, Modo imposes redemption thresholds that encourage extended gambling rather than prize redemption. Players must accumulate at least 100 Sweepstakes Coins before redeeming prizes, effectively forcing continued play, exacerbating addiction and gambler tendencies, and increasing the user's risk of loss.

55. Fifth, players overwhelmingly ignore their large supplies of non-redeemable Gold Coins and focus exclusively on Sweepstakes Coins, confirming that the true object of the transaction is the ability to wager and win money—not to obtain Gold Coins.

56. In short, Modo has modernized the Internet-café playbook. Instead of selling Internet time, phone minutes, or small retail goods bundled with "free" sweepstakes entries, Modo sells virtual Gold Coins that exist only to disguise the paid acquisition of redeemable Sweepstakes Coins.

57. The owners of a competing gambling website, ChumbaCasino.com, admitted in public securities filings that "social casino" websites like Modo.us were modeled after the illegal Internet-café sweepstakes model:

> 67 Over the last 10 years, 'Internet Sweepstakes Cafes' have evolved and proliferated across the US. They operate as internet cafes that offer their customers entrance into a sweepstakes draw upon the purchase of a product, often internet time or telephone call minutes. The participant can find out whether they have won the pre-determined draw by a simple reveal but many choose to do so through a programme that simulates a slot machine or poker game. This may even include an online element, but neither the presentation nor their interaction affects the outcome of the draw.
>
> 68 Increasingly sweepstakes gaming has emerged out of these cafes, with consumer products allowing 'free' entrance into games in which cash prizes can be won in return.

58. Those same filings by Modo competitor Chumba also describe the lucrative scale of this business, reporting that "Internet sweepstakes Cafes are reported to have turned over $10bn (€9.4bn) in 2015, with over 5,000 now operating in 12 states" (*id.* at 69) and identified the "significant opportunity" in adopting the "sweepstakes café model." *Id.* at 95-96.

59. The parallels between Modo's Casino Website and the Internet-café business model—which courts have uniformly held to constitute gambling—are unmistakable :

- Both sell a nominal "product" that comes bundled with a commensurate number of "free" sweepstakes entries to play real money 'casino-style' games of chance in a 'casino-like' setting. Instead of the cafés selling a "prepaid phone card," Defendant sells a virtual gold coin.
- Both operate sweepstakes games perpetually, not on limited-duration promotions, as is typical with legitimate promotional sweepstakes like the McDonald's Monopoly sweepstakes.
- Both offer casino-level payouts, often exceeding 90% or more of revenues, whereas legitimate promotional sweepstakes normally have very low prize to revenue ratios.
- Both advertise a theoretical "no-purchase-necessary" mail-in option that is practically meaningless and rarely used.

60. Modo does not distribute any free-play tokens through retail outlets or other locations in Oregon, nor does it run the "sweepstakes" for any fixed promotional period. Instead, the Modo Casino Website operates perpetually and *is itself* the product and service being sold.

**C. <u>Modo Promotes Gambling To Underage Minors</u>**

61. The National Institutes of Health reports that "despite its illegality among adolescents, online gambling is a common practice, which puts their mental health and well-being at serious risk." J. Behav. Addict., 2021 Sept. 16;10(3):566-586. Research shows a "greater addictive potential of online gambling over traditional gambling, especially for young problem gamblers." This heightened risk is due to the developmental characteristics of adolescence, where individuals are more likely to engage in risky behaviors and develop addiction problems due to immature self-regulation capacity, impulsivity, external locus of control, and susceptibility to contextual factors. *Id.*

62. The same research warns that adolescents are especially susceptible to the stimuli commonly used in online gambling: "lured by the pop-up gambling advertisements, offers of gifts and free play, tempting easy win messages, thrill of many online games, and visually exciting graphics and photos presented with the games." *Id.* These design features, all of which are prominently displayed on the Modo Casino Website, are deliberately engineered to attract and retain young players.

63. The younger the age of online gambling onset, the higher the probability of developing problem gambling and the more severe the psychosocial consequences are. Early exposure is a significant predictor of lifelong gambling addiction.

64. According to a 2024 University of Michigan national poll on children's health, nearly one-third of U.S. parents say that they or another adult in their household have gambled. Among those households, two-thirds reported that their teen had a bank account or credit card in their own name. One in six parents admitted they would not know if their own child was gambling online.

65. Modo exploits this vulnerability for profit. By marketing casino-style games with bright, animated graphics, "free play" offers, and prize-redemption incentives that mimic real-money gambling, Modo ensures that minors can easily access and engage with its Casino Website. Modo's failure to implement any meaningful age-verification or geolocation safeguards further facilitates underage gambling and amplifies the resulting harm.

**D. <u>Modo Misleads The Public With False Claims Of Legality</u>**

66. Modo also engages in unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce by misleading and causing consumers to believe that participation in the Modo Casino Website is legal in Oregon.

67. On the Modo Casino Website, Modo tells users:

> If you live in any of the excluded territories identified below, do not proceed any further as you are not eligible to access or use the platform, create a customer account, play the games or interact with Modo in any other way.

68. Modo then lists the following "Excluded Territories":

> Arizona, Connecticut, Delaware, Idaho, Louisiana, Maryland, Michigan, Montana, Nevada, New Jersey, New York Pennsylvania, Rhode Island, Washington, or West Virginia

69. Notably, Modo does not include Oregon as an excluded territory, even though online gambling in any form is strictly prohibited under Oregon law.

70. Further, Modo states that, if the user is in an excluded territory, the user will not be able to access or even use the platform, create an account, play the games, or interact with the Modo in any other way. Yet Modo deliberately allows full access to the Modo Casino Website in the State of Oregon, knowing that its Website is unlawful in Oregon.

71. By affirmatively excluding some states while omitting Oregon, Modo intentionally creates the false impression that Oregon is a jurisdiction in which its gambling Website is permitted. This omission, combined with Modo's marketing and unrestricted access, misleads reasonable consumers into believing the Website is legal, approved, or regulated by the State of Oregon.

72. Modo's deception is material: Oregon residents, including Plaintiff, would not have gambled on the Modo Casino Website had they known the truth—that Modo's online casino operations are illegal in Oregon.

**IV. No Valid or Enforceable Contract Exists Between the Parties, Including the Arbitration Agreement**

73. The only consideration Modo provided in exchange for Plaintiff and the Class members' purported agreement to arbitrate was the ability to gamble on Modo's illegal website.

74. Because gambling contracts are illegal and void under Oregon law, no valid agreement was ever formed between Plaintiff and Defendant. The Oregon Supreme Court has made clear that a contract founded upon illegal consideration "will not be enforced." *Hendrix v. McKee*, 281 Or. 123, 128 (1978) (voiding employment contract involving design of gambling devices); *see also Barton v. Simmons*, 129 Or. 457, 466–67 (1929) (recognizing that gambling and other illegal contracts are "void as against public policy."). Any purported Terms and Conditions, including any arbitration clause or class-action waiver, are therefore void and without legal effect.

75. Alternatively, the Terms and Conditions are unconscionable. They are presented on a take-it-or-leave-it basis, with no opportunity for negotiation, and users cannot access the Website without purportedly agreeing to them.

76. The arbitration clause is buried in uniform text, not highlighted or separately acknowledged, and imposes unfair restrictions—limiting damages, denying participation in arbitrator selection, prohibiting class actions, and requiring individualized proceedings whose costs would exceed the value of any individual claim.

77. The Terms and Conditions also permit Modo to change the contract at any time without notice, rendering any supposed agreement illusory. Users therefore received no lawful or meaningful consideration for purportedly waiving their statutory and constitutional rights.

78. Plaintiff and Class Members were additionally misled into accepting these terms by Modo's false representation and omission that its gambling website was lawful in Oregon. Had

Modo disclosed the truth—that the Website constitutes illegal gambling—Plaintiff and Class Members would not have assented to any terms.

## CLASS ACTION ALLEGATIONS

79. Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.

80. The Plaintiff seeks to represent the following Oregon Class ("Class") defined as:

> All persons in Oregon who have paid and lost money or other things of value on Modo.us.

81. Excluded from the Class are Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case. Plaintiff reserves the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

82. This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

83. **Numerosity – Federal Rule of Civil Procedure 23(a)(1)**. The members of the Class are so numerous and geographically dispersed that individual joinder of all class members is impracticable. While Plaintiff is informed and believe that there are hundreds to thousands of members of the Class, the precise number of Class Members is unknown to Plaintiff, but may be ascertained from Defendant's books and records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

84. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a. Whether Defendant engaged in the conduct alleged herein;

b. Whether Defendant's alleged conduct violates applicable law;

c. Whether the Modo Casino Website is illegal gambling in Oregon;

d. Whether Plaintiff and Class members wagered and lost money or other things value on the Modo Casino Website in Oregon;

e. The amount of money or other things of value wagered and lost by Plaintiff and Class members in Oregon;

f. whether Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

g. the amount and nature of relief to be awarded to Plaintiff and the other Class members.

85. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the other Class members' claims because Plaintiff and the Class members wagered and lost money or other things of value on Modo.us in Oregon. Also, neither Plaintiff nor the other Class Members would have participated on Modo.us had Defendant not engage in unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce. Plaintiff and the other Class members suffered damages as a direct proximate result of the same wrongful practices in which Defendant engaged. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other Class members.

86. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other members of the Class that he seeks to represent, Plaintiff retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and his counsel.

87. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class members as a whole.

88. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims, so it would be impracticable for the Class members to individually seek redress. Even if the Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

89. **Ascertainability –** Modo maintains a robust database with all its participants. Each participant must create an account to participate and must select and verify which state they are from. Modo also assigns each participant's account an individually identifiable number, and Modo tracks winning and losses, because it controls how much a player can wager and cashout a day.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Declaratory Judgment
### (28 U.S.C. §§ 2201 *et seq.*)

90. Plaintiff repeats and realleges all other paragraphs as if fully set forth herein.

91. Plaintiff brings this count individually and on behalf of all other Class members.

92. Oregon law strictly regulates and prohibits most forms of gambling.

93. Under Oregon law, unless the legislature specifically authorizes it, gambling is unlawful. *See* ORS 167.117(24) ("unlawful" means "not specifically authorized by law").

94. Under Oregon law, "gambling" occurs when "a person stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under the control

or influence of the person, upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome." ORS 167.117(7).

95. A game is one of chance—not skill—when chance predominates in determining the outcome.

96. Modo operates an online casino at www.Modo.us (the "Modo Casino Website") that requires participants pay consideration for the chance to win a prize.

97. The "Chance Games" offered by Modo on its Modo Casino Website are predominantly games of chance and do not involve any level of skill.

98. The prizes Modo offers are valuable and redeemable or convertible into U.S. currency, including cash (via the Debit Card used to purchase Casino Website chips or ACH Bank Transfers), gift cards, or cryptocurrency.

99. Modo's operations constitutes illegal gambling rather than a legitimate sweepstakes. In Oregon, a gambling scheme remains unlawful even if the player is guaranteed something of nominal value or if free plays are available. *State v. Langan*, 293 Or. 654, 657 (1982) (holding that a device is not excluded from the definition of illegal gambling "merely by virtue of the fact that they return free additional games or plays."). In fact, even paying back up to 98% of all money played is illegal gambling (where the typical sweepstakes payout is 50%). Modo's so-called "free" play is limited, awards no redeemable prizes, and serves only to induce paid gambling. Moreover, Modo does not promote or market any separate good or service, it *is* the good or service.

100. Plaintiff and Class members each paid money or other things of value to Modo to play the Chance Games for the sole purpose of winning a prize of monetary value.

101. Modo also violates the Unlawful Internet Gambling Enforcement Act by accepting credit cards for gambling. *See* 31 U.S.C. §§ 5361-5367.

102. An actual and justiciable controversy exists between the parties regarding the legality of Modo's gambling operation. Plaintiff and Class members seek an order declaring that

(1) Modo's operation of Modos.us constitutes illegal gambling under Oregon law; and (2) any authority under which Modo purports to operate is invalid or unconstitutional.

103. Plaintiff and the Class further seek a permanent injunction enjoining Modo from offering or operating the Modos.us gambling Website in Oregon, and an order requiring disgorgement of all profits derived from Oregon consumers.

104. Pursuant to Fed. R. Civ. P. 57, Plaintiff and Class members also seek a speedy declaratory-judgment hearing to resolve these questions of law and prevent continuing harm.

## SECOND CAUSE OF ACTION

### Oregon Gambling Loss Recovery Statute
### (Oregon Rev. Stat. § 30.740, *et seq.*)

105. Plaintiff repeats and realleges all other paragraphs as if fully set forth herein.

106. Plaintiff brings this count individually and on behalf of all other Class members.

107. Plaintiff and Class Members are Oregon residents who have paid and lost money or other things of value to Modo on the Modo Casino Website (www.Modo.us), or are the spouses, children, or next of kin of Oregon residents who have done so.

108. Oregon law prohibits gambling that is not specifically authorized by law. ORS 167.117(7)–(9), 167.122, 167.127, 167.147, 167.164.

109. A person "commits the crime of unlawful gambling in the first degree if the person knowingly promotes or profits from unlawful gambling." ORS 167.127.

110. Oregon further prohibits the possession or use of gambling devices—including slot machines and electronic devices that simulate casino games—unless expressly authorized by law. ORS 167.117 (8)-(9), 167.164, 167.147.

111. Internet gambling is not authorized by law. ORS 167.117. To the contrary, Oregon makes it a Class C felony to accept credit cards or similar instruments for the purpose of Internet gambling. *See* ORS 167.109.

112. Modo owns, controls, operates, manages, supervises, or directs an Internet website—the Modo Casino Website (www.Modo.us)–at which unlawful wagers may be placed, received, or otherwise made. 31 U.S.C. § 5367.

113. Modo is the proprietor who operates an illegal Internet gambling enterprise through the Casino Website that is accessible in Oregon, which offers chance-based casino-style games in exchange for money or things of value, from which Modo profits.

114. ORS 30.740 provides a losing gambler with a first-party cause of action to recover twice the amount of any losses suffered. Under ORS 30.740:

> All persons losing money or anything of value at or on any unlawful game described in ORS 167.117, 167.122 and 167.127 shall have a cause of action to recover from the dealer winning the same, or proprietor for whose benefit such game was played or dealt, or such money or thing of value won, twice the amount of the money or double the value of the thing so lost.

115. Modo is the proprietor for whose benefit the unlawful games on the Modo Casino Website were played.

116. Plaintiff and other Class members each paid and lost money or other things of value to Modo on those unlawful games at the Modo Casino Website.

117. Accordingly, Plaintiff and other Class members are entitled to recovery of twice the amount of money of their losses, together with pre- and post-judgment interest.

118. Plaintiff also brings this claim on behalf of the spouses, children, and next of kin of Oregon residents who paid and lost money or things of value to Modo.

## THIRD CAUSE OF ACTION

### Violations of the Unlawful Trade Practices Act
### (Oregon Revised Statutes § 646.605, *et seq.*)

119. Plaintiff repeats and realleges all other paragraphs as if fully set forth herein.

120. Plaintiff brings this count individually and on behalf of all other Class members pursuant to ORS 646.638.

121. The Oregon Unlawful Trade Practices Act (UTPA) prohibits unlawful practices in the course of a person's business, including "unfair or deceptive conduct in trade or commerce." ORS 646.608(1)(u).

122. Modo, Plaintiff, and Class members are "persons" within the meaning of ORS 646.605(4).

123. Modo offered "goods or services" within the meaning of ORS 646.605(6)(a).

124. Modo is engaged in "trade" or "commerce" within the meaning of ORS 646.605(8).

a. The UTPA provides a non-exhaustive list of unlawful, unfair or deceptive conduct, including but not limited to:Causing "likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of [] goods or services." ORS 646.608(1)(b);

b. Causing "likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another." ORS 646.608(1)(c);

c. Representing that "goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the [] goods or services do not have or that a person has a sponsorship, approval, status, qualification, affiliation, or connection that the person does not have." ORS 646.608(1)(e);

d. Representing that "goods or services are of a particular standard, quality, or grade, or that real estate or goods are of a particular style or model, if the [] goods or services are of another." ORS 646.608(1)(g);

e. Advertising "goods or services with intent not to provide the [] goods or services as advertised, or with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity." ORS 646.608(1)(i); and

f. Making "any false or misleading statement about a prize, contest or promotion used to publicize a product, business or service." ORS 646.608(1)(p).

125. The UTPA also prohibits conduct that "[v]iolates ORS 646A.803," ORS 646.608(1)(uu). ORS 646A.803(3)(a) specifically forbids a person from soliciting "participation

in a sweepstakes and does not clearly and conspicuously disclose in the solicitation . . . [t]he odds of winning in Arabic numerals."

126. As alleged herein, Modo violated the UTPA by engaging in unfair, and deceptive trade practices, including by:

a. Operating an online gambling enterprise disguised as a "sweepstakes" and soliciting participation without clearly or conspicuously disclosing the odds of winning, instead using vague "volatility" labels without numeric value;

b. Reserving the right to alter odds at any time, rendering any purported disclosure meaningless;

c. Misrepresenting or causing confusion and misunderstanding that gambling on the Modo Casino Website is legal and approved or certified by the State of Oregon;

d. Representing that its goods or services are lawful, approved, or of a particular standard or quality when, in fact, Internet gambling is illegal in Oregon; and

e. Omitting material information necessary to dispel the misleading impression that participation on Modo.us was lawful.

127. Other unconscionable, false, misleading, or deceptive acts or business practices employed by Modo include:

a. deceiving or confusing customers into believing that their gambling transactions confer or involve certain rights, remedies, or obligations (i.e., the right to recover winnings and the obligation to pay for losses), when in fact any such rights, remedies, or obligations are void and prohibited by Oregon law; and

b. representing that the Modo Casino Website users will receive an economic benefit (in the form of gambling winnings), when that benefit is contingent on a chance event to occur subsequent to the consummation of the transaction (i.e., winning the bet).

128. To the extent required by law, Modo owed a duty to disclose to Plaintiff and the Class that participation on its Website is illegal in order to dispel misleading impressions it created that participation on Modo's Casino Website was legal.

129. Modo's unfair or deceptive acts or practices were material, were likely to deceive reasonable consumers, and did in fact deceive Plaintiff and Class members, causing them to pay money or other things of value to Modo.

130. Modo acted knowingly and willfully, with intent to mislead consumers about the nature and legality of its gambling Website.

131. Modo's violations present a continuing risk of harm to Plaintiff and the Class members, as well as to the general public. Modo's unlawful acts and practices complained of herein affect the public interest.

132. Plaintiff and Class members suffered ascertainable losses and actual damages as a direct result of Modo's conduct. Plaintiff and other Class members would not have participated or lost money or property on the Modo Casino Website had Modo disclosed the true nature of the Modo Casino Website.

133. Pursuant to ORS 646.605, 646.638, and 646.656, Plaintiff and the Class members seek an order enjoining Modo's unfair and deceptive acts or practices and awarding actual or statutory damages, whichever is greater, punitive damages, restitution, reasonable attorneys' fees and costs, and any other relief that the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's attorneys as Class Counsel;

B. Declaring that Modo.us constitutes illegal gambling under Oregon law and that any authority under which it purports to operate is unconstitutional and void;

C. Enter a permanent injunction permanently enjoining Defendant from operating Modo.us or any similar Internet gambling enterprise in Oregon;

D. Ordering Defendant to refund all money or things of value lost by Plaintiff and the Class and pay actual and statutory damages (including punitive damages) and restitution and disgorgement of profits to Plaintiff and the Class, as allowable by law;

E. Ordering Defendant to pay both pre- and post-judgment interest on any amount awarded;

F. Ordering Defendant to pay Plaintiff's attorneys' fees and costs of suit; and

G. Ordering such other and further relief as the Court may deem just, equitable, and proper.

**JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: November 6, 2025

**JOHNSON JOHNSON LUCAS & MIDDLETON**

*s/ Marilyn Heiken*

Marilyn A. Heiken, OSB #923308
mheiken@justicelawyers.com
975 Oak Street, Suite 1050
Eugene, OR 97401
Telephone: (541) 484-2434
Facsimile: (541) 484-0882

**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
W. Daniel "Dee" Miles, III*
dee.miles@beasleyallen.com
James Mitchell "Mitch" Williams*
mitch.williams@beasleyallen.com
Dylan T. Martin*
dylan.martin@beasleyallen.com
Trenton H. Mann*
trent.mann@beasleyallen.com
272 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103-4160
Tel: 334/269-2343

334/954-7555 (fax)

**BLOOD HURST & O'REARDON, LLP**
Timothy G. Blood*
tblood@bholaw.com
Thomas J. O'Reardon II*
toreardon@bholaw.com
James M. Davis*
jdavis@bholaw.com
501 West Broadway, Suite 1490
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)

**SMITH KRIVOSHEY, PC**
Joel D. Smith*
joel@skclassactions.com
867 Boylston Street 5th Floor #1520
Boston, MA 02116
Tel: 617/377-4704
888/410-0415 (fax)

**Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff and the Class*